## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE HURON CONSULTING GROUP, INC. DERIVATIVE LITIGATION | Lead Case No. 09-cv-6284 |
| | Judge Elaine E. Bucklo |
| This Document Relates To: | **JURY TRIAL DEMANDED** |
| ALL ACTIONS | |

## VERIFIED AMENDED CONSOLIDATED
## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs, by and through their attorneys, derivatively on behalf of Nominal Defendant Huron Consulting Group, Inc. ("Huron" or the "Company"), allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available documents regarding Huron, as follows:

## NATURE OF THE DERIVATIVE ACTION

1. This is a shareholder derivative action brought by Plaintiffs Oakland County Employees' Retirement System, Philip R. Wilmore, and Lawrence J. Goelz, on behalf of Huron and against the members of its Board of Directors (the "Board") and certain of its current and former executive officers seeking to remedy defendants' breaches of fiduciary duties and other violations of law. The defendants include: George E. Massaro, DuBose Ausley, James D. Edwards, H. Eugene Lockhart, John S. Moody, John McCartney, Gary E. Holdren, Gary L. Burge, and Wayne Lipski (the "D&O Defendants").

2.      Plaintiffs bring this derivative action on behalf of nominal defendant Huron, seeking relief for the damages sustained as a result of the D&O Defendants' violations of state law, including their breaches of fiduciary duties of good faith and loyalty, as well as waste of corporate assets and unjust enrichment.

3.      Huron was founded in 2002 by partners from the accounting firm Arthur Andersen after that firm was implicated in the Enron accounting scandal. Huron bills itself as possessing expertise in accounting, corporate governance, regulatory, and compliance issues. Notably, Defendant Holdren, one of Huron's founders and its longtime Chief Executive Officer ("CEO") until 2009, once noted at an analyst's conference, "We like people to commit fraud. We like stealing. We like all those things because it creates an opportunity for us to help somebody."

4.      On Friday, July 31, 2009, Huron issued a press release (the "July 31, 2009 Press Release"), stating that the Company would restate its financial statements "for the fiscal years 2006, 2007 and 2008 and the first quarter of 2009" (the "Restatement"). The stated reason for the Restatement was the failure of the Company to correctly account for "certain acquisition-related payments received by [certain persons] in connection with the sale of certain acquired businesses that were subsequently redistributed among themselves and to other select Huron employees." The payments in question were related to four out of seven acquisitions that occurred from 2005 to 2007, all of which were extremely important to the Company and its rapidly expanding business.

5.      The Restatement stems from the redistribution of the Company's acquisition-related payments that it made to the "selling shareholders" of the businesses it acquired. Some of the acquisition-related payments were redistributed among the selling shareholders in amounts

that were disproportionate to their interests in the acquired businesses; other payments were redistributed to Huron employees who were not selling shareholders but had been employed by the "selling shareholders."  All of the payments were "earn-out payments" contingent on: (a) continuing employment at Huron; or (b) the acquired business achieving certain performance benchmarks once it became a wholly-owned subsidiary of Huron.  The Restatement concedes that management was aware of the improper practices at all relevant times.

6.      The earn-out payments, however, were not recorded in accordance with Generally Accepted Accounting Principles ("GAAP").  According to GAAP, an issuer such as Huron must first disclose the payments and then record them for tax purposes as non-cash compensation expenses.  Once classified as an expense, the amount must be charged (deducted) against a company's earnings, thus reducing reportable net income.

7.      The Company improperly accounted for the acquisition-related payments as goodwill, instead of compensation expenses.  Goodwill arises when a company is purchased for more than the fair value of the identifiable assets of the company.  The difference between the purchase price and the sum of the fair value of the net assets is by definition the value of the "goodwill" of the purchased company.  The accounting rules governing these transactions are relatively simple and have been in existence for years.

8.      The relevant GAAP provision was Financial Accounting Statement No. 141 ("FAS 141"), Business Combinations, issued in June 2001.  Paragraph 34 of FAS 141 states: "If the substance of the agreement for contingent consideration is to provide compensation for services or use of property or profit sharing, the additional consideration given shall be recognized as an expense of the appropriate periods."  FAS 141 affects both the accounting for

3

and the valuation of the acquired goodwill in most acquisitions. The valuation of goodwill is important to any acquisition because it affects the company's financial statements.

9.     The D&O Defendants knew that goodwill was an important aspect of the Company's major acquisitions and that the valuation of goodwill had a significant impact on the Company's financial statements. Indeed, Huron is in the business of providing financial consulting services and handles such valuations for its clients. Moreover, a majority of the D&O Defendants are purported financial and accounting experts. For example, Defendants Holdren, Lipski, Massaro, and Edwards are CPAs, and Defendants Lockhart and McCartney hold MBAs. Nearly all of the D&O Defendants have served as accountants, auditors, and/or financial officers during their careers. Therefore, the D&O Defendants knew that such improper accounting practices violated GAAP.

10.    However, these improper accounting practices were allowed to develop and continue for many years and involved four out of seven major acquisitions during the relevant period. The Director Defendants (defined herein) failed to implement monitoring, reporting and information controls that would have prevented these improprieties. There was no specific system in place for the Board to fulfill its responsibility to ensure proper accounting for goodwill and acquisition-related expenses. Because of the lack of information or reporting systems, the Board had no way of detecting the earn-out payments and overseeing and monitoring whether the Company was assessing goodwill accurately. As such, the Director Defendants completely abdicated their fiduciary obligations to the Company and its shareholders.

11.    Huron's improper accounting practices resulted in a material overstatement of its earnings. These improper accounting practices affected every financial statement the Company

filed with the SEC between 2006 and 2009. Specifically, this improper accounting practice overstated Huron's EBITDA and net income by approximately $57 million.

12. According to the July 31, 2009 Press Release, the misstatement of acquisition-related benefits to employees at Huron extends back for more than four (4) years. *See* July 31, 2009 Press Release ("The restatement relates to four businesses that the Company acquired between 2005 and 2007."). Nonetheless, the July 31, 2009 Press Release states that the Company's Audit Committee allegedly did not learn about the fraud until "recently." Further, Huron withdrew its 2009 earnings guidance, lowered its 2009 revenue guidance and reported second-quarter revenue below analysts' expectations.

13. The effect of the Restatement on Huron's business and profits is profound. While the Company has attempted to downplay the damage and effect of the Restatement, it represents a huge blow to the Company and its future prospects. For instance, in fiscal year 2008, Huron first reported net income of $41 million. The Restatement, however, reduced that figure by over 75% to $10 million. Further, the Restatement sliced aggregate EBITDA for fiscal year 2008 by a quarter from $122 million to only $91 million.

14. Finally, in this same announcement, Huron informed investors that Officer Defendants Holdren, Lipski, and Burge were resigning from their respective posts with Huron due to the accounting scandal. Also, due to the nature of Huron's business—consulting other corporations on compliance and regulatory matters—the Restatement has, and will continue to cause, millions of dollars worth of lost business and impaired goodwill in the industry.

15. The announcement of the Restatement not only came as a complete shock to the market and shareholders, but immediately caused Huron's common stock to lose almost 70% of

its value in one day, dropping from its closing price of $44.35 per share on July 31, 2009 to $13.69 at the close of the next trading day.

16.     As a result of the D&O Defendants' failure to comply with their fiduciary duties, the Company has suffered from the misappropriation and misuse of proprietary non-public material corporate inside information concerning Huron's inflated financial statements, which permitted certain defendants to profit unjustly, and caused the situation of the Company to be misrepresented beginning on March 31, 2006 up until July 31, 2009.

17.     Furthermore, the D&O Defendants' wrongdoing has exposed Huron to massive liability in the form of costs and expenses in connection with government investigations, as well as other losses and damages.  Indeed, because the very nature of its operations is to advise companies on how to avoid accounting missteps, Huron's reputation and goodwill have been irreparably damaged.  The D&O Defendants instead permitted Huron to engage in the type of malfeasance Huron purports to help others avoid.  As such, the D&O Defendants have breached their duties to the Company and shareholders, causing damages to Huron.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds the jurisdictional amount of $75,000, exclusive of interest and costs.  In addition, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(a)(1) because Defendant Huron is headquartered in this District.  Moreover, a substantial portion of the occurrences complained of herein, including the Defendants' announcement of the

Restatement, occurred in this District.  In addition, one or more of the Defendants either reside in, or maintain offices, in this district.

## THE PARTIES

**The Plaintiffs**

20.     Plaintiff Oakland County Employees' Retirement System, a citizen of Michigan, invests retirement savings for employees of Oakland County, Michigan, is a shareholder of Huron, was a shareholder of Huron at the time of the wrongdoing alleged herein, and has been a shareholder of Huron continuously since that time.

21.     Plaintiff Philip R. Wilmore, a citizen of Kansas, is a shareholder of Huron, was a shareholder of Huron at the time of the wrongdoing alleged herein, and has been a shareholder of Huron continuously since that time.

22.     Plaintiff Lawrence J. Goelz, a citizen of North Carolina, is a shareholder of Huron, was a shareholder of Huron at the time of the wrongdoing alleged herein, and has been a shareholder of Huron continuously since that time.

**The Nominal Defendant**

23.     Nominal Defendant Huron is incorporated in Delaware and maintains its principal offices at 550 West Van Buren Street, Chicago, Illinois 60607.  Huron provides consulting services throughout the United States and states that it assists to improve performance, comply with complex regulations, resolve disputes, recover from distress, leverage technology, and stimulate growth.  Huron states it provides services to a wide variety of both financially sound and distressed organizations, including leading academic institutions, healthcare organizations, Fortune 500 companies, medium-sized businesses, and the law firms that represent these various organizations.  Huron holds itself out as a consulting service to help

companies avoid the very type of securities and accounting scandals that the Company now faces.

**The Director Defendants**

24.     The following parties, who are collectively referred to herein together with Defendant Holdren as the "Director Defendants," served as members of the Board of Directors of Huron during the relevant period as follows:

25.     Director Defendant George E. Massaro ("Massaro") has served as Non-Executive Chairman of the Board of Huron since July 31, 2009.  He had previously served as Vice Chairman since March 2005, and he has served as a director since May 2004.  Effective February 16, 2009, Massaro ceased to be an employee of the Company.  He had served as the Chief Operating Officer of Huron from June 2003 until March 2005.  Upon information and belief, Massaro is a citizen of Illinois.

26.     Director Defendant DuBose Ausley ("Ausley") has served as a director of Huron since October 12, 2004 and also has been appointed to Huron's Audit, Compensation, and Governance Committees.  Ausley is an employee of Ausley & McMullen P.A., a law firm in Tallahassee, Florida, and has experience in corporate litigation.  Upon information and belief, Ausley is a citizen of Florida.

27.     Director Defendant James D. Edwards ("Edwards") has served as a director of Huron since October 12, 2004 and also has been appointed to Huron's Governance Committee (of which he is Chairman) and Audit Committee.  Edwards retired in 2002 as managing partner—global markets of Arthur Andersen LLP, a position he had held since 1998.  Upon information and belief, Edwards is a citizen of Illinois.

28.     Director Defendant H. Eugene Lockhart ("Lockhart") has served as a director of Huron since December 5, 2006 and also has been appointed to Huron's Compensation and Governance Committees.  Lockhart is a citizen of Virginia.

29.     Director Defendant John S. Moody has served as a director of Huron since November 8, 2005 and also has been appointed to Huron's Compensation Committee (of which he is Chairman) and Governance Committee.  Upon information and belief, Moody is a citizen of Texas.

30.     Director Defendant John McCartney ("McCartney") has served as a director of Huron since October 12, 2004 and also has been appointed to Huron's Audit Committee (of which he is Chairman) and Compensation Committee.  Upon information and belief, McCartney is a citizen of Illinois.

**The Officer Defendants**

31.     The following parties, who are collectively referred to herein as the "Officer Defendants," served in direct and substantial management positions during the relevant period as follows:

32.     Officer Defendant Gary E. Holdren ("Holdren") served as CEO and Chairman of the Board of Directors of Huron until his resignation effective on July 31, 2009.  Holdren was one of the founders of Huron along with a group of other financial and operational consultants in 2002.  Before co-founding Huron, Holdren worked for more than 25 years at Arthur Andersen, becoming a partner, member of the executive committee, and worldwide director of financial and economic consulting.  Upon information and belief, Holdren is a citizen of Illinois.  During the relevant period, Holdren, based on his knowledge of material non-public information regarding the Company, sold shares of Huron common stock for gross proceeds of over $9 million.

33.     Officer Defendant Gary L. Burge was, at all relevant times, the Company's Chief Financial Officer ("CFO") until he resigned on July 31, 2009.  After starting his career at the accounting firm Haskins & Sells (now Deloitte LLP), Burge held a number of senior financial positions at publicly held companies, including as CFO at Morningstar, Inc.  Upon information and belief, Burge is a citizen of Illinois.

34.     Officer Defendant Wayne Lipski was, at all relevant times, the Company's Chief Accounting Officer ("CAO") until he resigned on July 31, 2009.  Before joining Huron, Defendant Lipski worked as a senior auditor at Andersen and in other senior accounting and finance positions.  Upon information and belief, Lipski is a citizen of Illinois.

35.     The Director Defendants and Officer Defendants are all collectively referred to herein as the "D&O Defendants."

## DUTIES OF THE D&O DEFENDANTS

36.      By reason of their positions as officers, directors, and/or fiduciaries of Huron and because of their ability to control the business and corporate affairs of Huron, the D&O Defendants owed Huron and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Huron in a fair, just, honest, and equitable manner.  The D&O Defendants were and are required to act in furtherance of the best interests of Huron and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Huron and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

37.     To discharge their duties, the officers and directors of Huron were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Huron were required to, among other things:

    a.    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

    b.    exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c.    when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

    d.    establishing, maintaining, and overseeing adequate internal accounting controls for the Company and ensuring that the Company's financial statements were based on accurate financial information.

38.     All employees of Huron, including the D&O Defendants, were required to comply with the Company's Code of Business Conduct and Ethics (Amended and Readopted – December 4, 2008).  The Company's Code of Business Conduct and Ethics stated, in relevant part:

### **RESPONSIBILITY TO OUR ORGANIZATION**

**Compliance With Laws, Rules And Regulations**

You are required to comply with the laws, rules and regulations that govern the conduct of our business, both in the U.S. and in other countries, including the states and other jurisdictions that regulate the Company's activities. If you have questions about the applicability or meaning of a law, rule or regulation, please consult your practice group leader or the Compliance Officer.

*       *       *

**Company Books and Records**

As a public company, it is of critical importance that the

Company's filings with the Securities and Exchange Commission and other public statements, such as press releases, be full, fair and accurate, timely and understandable. Depending on your position with the Company, you may be called upon to provide information that ensures that the disclosures in the Company's public reports and other public statements are full, fair and accurate. If we request information from you, we expect you to take this responsibility very seriously and to provide prompt, accurate and complete answers to inquiries related to the Company's public disclosure requirements.

As applicable, you must maintain the Company's books, records, accounts and financial statements in reasonable detail to appropriately reflect the Company's transactions and must conform both to applicable requirements and to the Company's system of internal controls.

The Company's policy is to comply with all applicable financial reporting and accounting regulations applicable to the Company. If you have any concerns or complaints regarding questionable accounting or auditing matters of the Company, you are encouraged to report them as described in the Company's Policy on Reporting Concerns and Complaints Regarding Accounting, Internal Accounting Controls and Auditing Matters . . .

39. The Directors were required to comply with the Corporate Governance Guidelines of Huron Consulting Group, Inc. (Amended as of December 4, 2008). The guidelines specifically stated that all directors and officers were expected to act ethically and adhere to the Code of Business Conduct and Ethics, and that the goal is to build shareholder value and assure the vitality of the Company for clients and employees. The Corporate Governance Guidelines stated, in relevant part:

**Role of Directors**

The business and affairs of the Company shall be under the direction of the Board. A director is expected to spend the time and effort necessary to properly discharge such director's responsibilities. Accordingly, a director is expected to regularly attend meetings of the Board and committees on which such director sits, and to review prior to meetings material distributed in advance for such meetings. A director who is unable to attend a meeting (which it is understood will occur on occasion) or who wishes to participate telephonically is expected to notify the Corporate Secretary or the Chairman of the Board or the Chairman of the appropriate committee in advance of such meeting.

\*     \*     \*

12

### BUSINESS CONDUCT AND ETHICS

The Board expects all directors, as well as officers and employees, to act ethically at all times and to adhere to the Company's "Code of Business Conduct and Ethics."

40.     The D&O Defendants, particularly Burge, the former CFO, Lipski, the former CAO, and Audit Committee members McCartney, Edwards and Ausley, were responsible for maintaining and establishing adequate internal accounting controls for the Company and ensuring that the Company's financial statements were based on accurate financial information.

41.     According to the Charter of the Audit Committee (amended as of January 30, 2007), the Audit Committee's purpose was to oversee Huron's accounting and financial reporting process.  In addition, the committee was to review the effectiveness and adequacy of Huron's internal controls and accounting policies.  The Charter of the Audit Committee stated, in relevant part:

### I.  PURPOSE OF THE COMMITTEE

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Huron Consulting Group Inc. (the "Corporation") is to oversee the accounting and financial reporting processes of the Corporation and its subsidiaries and the audits of the financial statements of the Corporation.

*       *       *

### IV.  DUTIES AND RESPONSIBILITIES OF THE COMMITTEE

In carrying out its duties and responsibilities, the Committee's policies and procedures should remain flexible, so that it may be in a position to best address, react or respond to changing circumstances or conditions.  The following duties and responsibilities are within the authority of the Committee and the Committee shall, consistent with and subject to applicable law and rules and regulations promulgated by the SEC, Nasdaq, or any other applicable regulatory authority:

*       *       *

*Oversight of Annual Audit and Quarterly Reviews*

13

(e) Review and discuss with the independent auditors their annual audit plan, including the timing and scope of audit activities, and monitor such plan's progress and results during the year;

(f) Review with the Corporation's independent auditors the following information, which is required to be reported by the independent auditor:

> (i) all critical accounting policies and practices to be used;

> (ii) all alternative treatments of financial information that have been discussed by the independent auditors and management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors;

> (iii) all other material written communications between the independent auditors and management, such as any management letter and any schedule of unadjusted differences;

(g) Review with management and the Corporation's independent auditors and, if appropriate, the internal auditor, the Corporation's annual audited financial statements and quarterly financial statements, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and any major issues related thereto;

(h) Resolve all disagreements between the Corporation's independent auditors and management regarding financial reporting;

*Oversight of Financial Reporting Process and Internal Controls*
(i) Review the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures on a regular basis;

(j) Review with management, as the Committee determines to be necessary, the progress and results of material internal audit projects, and, when deemed necessary or appropriate by the Committee, direct the Corporation's chief executive officer to assign additional internal audit projects to the internal auditor;

(k) Review with the Corporation's independent auditors any matter related to the conduct of the audit which is to be communicated to the Committee under Generally Accepted Auditing Standards, particularly Statement of Auditing Standards No. 61, as it may be modified or supplemented, or the rules and regulations of the SEC;

(l) Receive periodic reports from the Corporation's independent auditors, management and the internal auditor to assess the impact on the Corporation of significant accounting or financial reporting developments that may have a bearing on the Corporation;

(m) Establish and maintain free and open means of communication between and among the Committee, the Corporation's independent auditors, the Corporation's internal auditing department and management;

(n) Review the type and presentation of information to be included in the Corporation's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Corporation to analysts and rating agencies (which review may be done generally (i.e., discussion of the types of information to be disclosed and type of presentations to be made), and the Committee need not discuss in advance each earnings release or each instance in which the Corporation may provide earnings guidance);

## BACKGROUND

42.    Huron is a consulting company that provides financial and legal consulting services to various institutions.  The Company was started in 2002 by former Arthur Andersen employees, including 25 partners, with the goal of specializing in consulting for bankruptcy and litigation, as well as health care and education.   The Arthur Andersen presence is still pronounced at the Company, as Defendants Massaro and Edwards are former Arthur Andersen partners.  Similarly, Defendant Holdren is a former Arthur Andersen partner.

43.    During the relevant period, the Company provided financial consulting services to a wide variety of sophisticated clients through its four business segments:   Accounting and Financial Consulting, Legal Consulting, Corporate Consulting, and Health and Education Consulting.   The Company promoted its Accounting and Financial Consulting segment as follows:

> Our Accounting and Financial Consulting segment assists corporations with complex accounting and financial reporting matters, financial analysis in business disputes, international arbitration and litigation, *as well as valuation analysis related to business acquisitions*.  This segment also consults with clients in the areas of corporate governance, Sarbanes-Oxley compliance, internal audit, and corporate tax.  Additionally, the Accounting and Financial Consulting segment provides experienced project

> leadership and consultants with a variety of financial and accounting credentials and prior corporate experience on an as-needed basis to assist clients with finance and accounting projects. This segment is comprised of certified public accountants, economists, certified fraud examiners, chartered financial analysts and valuation experts who serve attorneys and corporations as expert witnesses and consultants in connection with business disputes, as well as regulatory or internal investigations.

(emphasis added).

44. The vast majority of the D&O Defendants are purported financial and accounting experts who hold advanced degrees in such disciplines. For example, Defendants Holdren, Lipski, Massaro, and Edwards are CPAs, and Defendants Lockhart and McCartney hold MBAs. Nearly all of the D&O Defendants have served as accountants, auditors, and/or financial officers during their careers.

45. Throughout the relevant period, Huron consistently reported strong growth and impressive financial results. While Huron had approximately 770 full-time professionals at the start of 2006, it grew to employ over 2,100 professionals as of December 31, 2008. Reported earnings increased substantially during this time, rising from approximately $26 million in 2006 to approximately $41 million in 2008. Based on these positive reported results, Huron's stock price also increased substantially, from an average of $29 per share in April 2006 to an average of $49 per share in July 2009.

46. Much of Huron's growth was fueled by acquisitions of other consulting firms in multimillion dollar transactions. Specifically, between 2005 and 2007, Huron spent over $200 million to acquire the following seven consulting firms:

- May 9, 2005 – Speltz & Weis LLC ("S&W") for $17.2 million plus earn-out payments if S&W would meet certain performance targets;

16

- April 3, 2006 – MSGalt & Co LLC ("Galt") for $20.4 million plus earn-out payments if Galt would meet certain performance targets;

- July 31, 2006 – Document Review Consulting Services LLC ("DRCS") for approximately $16.7 million plus earn-out payments if DRCS would meet certain performance targets;

- July 31, 2006 – Aaxis Technologies, Inc. ("Aaxis") for approximately $7.9 million plus earn-out payments if Aaxis would meet certain performance targets;

- January 2, 2007 – Wellspring Partners ("Wellspring") for $68 million plus earnout payments if Wellspring would meet certain performance targets;

- January 2, 2007 – Glass & Associates ("Glass") for $31.8 million plus a payment to the selling shareholders in proportion to their respective ownership percentage of 5% of the combined revenues of Glass and Huron's restructuring consulting business, up to a maximum of $2 million; and

- July 2007 – Callaway Partners, LLC, ("Callaway") for $64.9 million plus earn-out payments if Callaway would meet certain performance targets.

47. Each of these acquisitions was large and crucially important to the Company, as they improved the Company's growth and bottom line. These important acquisitions helped the Company expand to a size of over 2,000 employees and generate revenues of approximately $600 million in 2008 and in 2009. Each acquisition was reviewed and approved by the entire Board of Directors.

48. As known by the D&O Defendants, the most important assets of the acquired consulting firms – as in any other professional services business – were its professionals. As Defendant Holdren told the financial analyst community on an August 7, 2007 conference call, "Retaining our best people is my highest priority at Huron."

49. Accordingly, when Huron acquired these firms, the D&O Defendants took measures to ensure that the owners, or "selling shareholders" of the companies which Huron

purchased, incentivized their key personnel over a number of years to remain with Huron after the acquisition. Huron agreed to make payments to the selling shareholders of the businesses that were purportedly in direct proportion to the ownership interests that the selling shareholders held at the time of the acquisition. In connection with at least four of the seven acquisitions, however, the selling shareholders had agreed to reallocate material amounts of these payments (1) to employees at the acquired companies who were not eligible to receive such payments because they were not "selling shareholders;" (2) to other selling shareholders in amounts disproportionate to their ownership interests; and (3) even to employees hired by Huron after the acquisition occurred. These earn-out payments arrangements were typically structured to apply for a period lasting between three to five years following the acquisition.

## **HURON'S IMPROPER ACCOUNTING**

50.     The financial statements and other statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.

51.     Under the plain and unambiguous accounting rules that had been in place for decades, and that Huron had helped its clients implement in their own businesses, Huron was required to account for the earn-out payments for what they were: employee compensation expenses. Huron, however, accounted for the payments as "goodwill," which was a violation of GAAP. Under GAAP, goodwill is the difference between the purchase price paid for a business and the fair value of the net assets being acquired, and is accounted for as an asset that does not reduce income (unlike expenses). Expensing the acquisition-related payments in accordance

18

with GAAP would have dramatically reduced Huron's publicly reported net income and earnings per share. Therefore, the D&O Defendants caused or allowed the Company to account for the payments as goodwill thereby avoiding reporting the acquisition-related payments as expenses.

52. Basic accounting rules provides conditions to booking acquisition-related payments as goodwill, *i.e.*, the payments are made (1) exclusively to the selling shareholders and not to any other employees; (2) only in direct proportion to the selling shareholders' ownership interests in the firm they had sold; and (3) without any strings attached to those earnout payments (for example, by requiring the continuing employment of the selling shareholders (or others) with the acquirer). If any of these criteria are not satisfied, then GAAP requires that the payments be instead reported as expenses.

53. The relevant GAAP provision was FAS 141. Paragraph 34 of FAS 141 states: "If the substance of the agreement for contingent consideration is to provide compensation for services or use of property or profit sharing, the additional consideration given shall be recognized as an expense of the appropriate periods." FAS 141 is consistent with the prior applicable GAAP standard, Accounting Principles Board Opinion No. 16, which had been effective since 1970. Both GAAP provisions require that the future salaries and bonuses of the selling shareholders be reflected as compensation expenses of the merged company rather than as part of the cost of the acquisition.

54. The Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB") issued additional guidance for accounting practitioners, entitled, "Accounting for Contingent Consideration Paid to the Shareholders of An Acquired Enterprise In A Purchase Business Combination," which is referred to as EITF No. 95-8. EITF No. 95-8 provides "criteria [that] should be used to determine whether contingent consideration based on earnings or other

performance measures should be accounted for as (1) an adjustment of the purchase price of an acquired enterprise or (2) compensation for services, use of property, or profit sharing." Those criteria are directly relevant to the accounting of the acquisition-related payments because they include whether "all selling shareholders receive the same amount of contingent consideration on a per share basis." See EITF No. 95-8, at 3. Another criterion concerns continuing employment: "The terms of continuing employment by selling shareholders who become key employees may be an indicator of the substance of a contingent consideration arrangement . . . . A contingent consideration arrangement in which the payments are automatically forfeited if employment terminates is a strong indicator that the arrangement is compensation for postcombination services." EITF No. 95-8, at 2. Therefore, pursuant to these EITF criteria, the acquisition-related payments should have been accounted for as compensation expenses.

55. Corporations that have completed a merger and acquisition transaction have to comply with the valuation and accounting provisions of FAS 141. In most acquisitions, FAS 141 affects both the accounting for and the valuation of the acquired company assets, and *particularly the acquired goodwill*. The valuation of goodwill is important to any acquisition because it affects all financial statements (*i.e.*, balance sheet, income statement and cash-flow statement).

56. Huron is in the business of providing financial consulting services. Remarkably, a majority of the D&O Defendants are purported financial and accounting experts. For example, Defendants Holdren, Lipski, Massaro, and Edwards are CPAs, and Defendants Lockhart and McCartney hold MBAs. Nearly all of the D&O Defendants have served as accountants, auditors, and/or financial officers during their careers. Therefore, they knew that goodwill was

an important aspect of the Company's major acquisitions and that the valuation of goodwill had a significant impact on the Company's financial statements.

57.     However, the acquisition-related payments made by Huron and accounted for as goodwill were not made in accordance with the selling shareholders' proportionate interests in the businesses and were not made exclusively to the selling shareholders, as set forth under FAS 141.  To the contrary, the payments were (1) received by the selling shareholders in amounts disproportionate with their respective interests; (2) made to ordinary Huron employees, including administrative staff, who held no ownership interest in the entity being acquired; and (3) even to employees Huron hired after the acquisition.  As the Company ultimately disclosed in its Form 10-K/A, employees who received these payments included client-serving and administrative "employees hired by or assigned to the respective Acquired Businesses after the date of such acquisitions."  Huron has admitted to violating GAAP in each of these respects.

58.     Moreover, in Huron's case, these payments were used, with the Officer Defendants' knowledge, to retain and reward key personnel and, as such, were required to be accounted for by Huron as compensation expenses reducing reported income and earnings performance.  Huron's accounting for the earn-out arrangements improperly transformed these compensation expenses into goodwill and created the illusion that Huron's financial performance was better than that of its competitors.

59.     Regulation S-X states that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.  (17 C.F.R. § 210.4-01(a)(1).  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure, which

would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

60. The fact that Huron restated its financial statements is an admission that they were false and misleading when originally issued. APB Opinion No.20, ¶¶ 7-13; SFAS No. 154, ¶ 25.

61. Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a) The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB Opinion No. 28, ¶ 10);

(b) The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Financial Accounting Concepts No. 1, ¶ 34);

(c) The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Financial Accounting Concepts No. 1, ¶ 40);

(d) The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Financial Accounting Concepts No. 1, ¶ 42);

(e) The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners

(stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Financial Accounting Concepts No. 1, ¶ 50);

       (f)    The principle that "financial reporting should be reliable [in that] it represents what it purports to represent" was violated (FASB Statement of Financial Accounting Concepts No. 2, ¶¶ 58-59);

       (g)    The principle of completeness, meaning that "nothing material is left out of the information that may be necessary to insure that it validly represents the underlying events and conditions" was violated (FASB Statement of Financial Accounting Concepts No. 2, ¶ 79); and

       (h)    The principle that conservatism be used as a "prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Financial Accounting Concepts No. 2, ¶ 95).

    62.    The omission of the information detailed above during the relevant period was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. § 229.303).

    63.    Huron's improper accounting practices caused Huron's earnings releases and financial statements to misstate the Company's net income and earnings per share because of the failure to properly account for certain acquisition-related payments to employees of businesses that Huron acquired between 2005 and 2007. Beginning with the April 27, 2006 release of its first quarter 2006 earnings and lasting until the July 31, 2009 Restatement, Huron's earnings releases and financial statements have incorporated this improper accounting and overstated Huron's income and earnings.

## DEFENDANTS' FAILURE TO OVERSEE HURON'S ACCOUNTING

64.     The D&O Defendants utterly failed to implement specific monitoring, reporting and information controls for the accounting of goodwill related to acquisitions, which would have detected the earn-out payments and prevented the improprieties at Huron.  The D&O Defendants breached their duties to remain reasonably informed by failing to assess, in good faith, the adequacy of the Company's reporting mechanisms.  This failure prevented the D&O Defendants from acquiring the timely and accurate information known to others in the Company; and prevented the D&O Defendants from acting to bring the Company into compliance with the law.

65.     The improper accounting practices caused Huron's earnings releases and financial statements to misstate the Company's net income and earnings per share because the D&O Defendants failed to properly account for certain acquisition-related payments to employees of businesses that Huron acquired between 2005 and 2007.  The D&O Defendants knowingly failed to ensure that adequate reporting mechanisms and internal controls were in place and were reasonably designed to bring these matters to their attention.

66.     The D&O Defendants continued to announce and affirm the Company's financial results even though they knew that no internal controls for accounting for goodwill were in place that would have uncovered the acquisition-related payments.  Quarter after quarter, year after year, beginning with the April 27, 2006 release of its first quarter 2006 earnings and continuing until the July 31, 2009 Restatement, the D&O Defendants systematically failed to properly assess its reporting and control mechanisms; this sustained failure prevented the critical information from reaching the D&O Defendants and caused the Company to make false and misleading statements regarding its financial results.

67.     These improper accounting practices were widely known throughout the Company.  On August 17, 2009, Huron filed an amended Form 10-K ("Form 10-K/A"), which stated that senior management was well "aware" that redistributions had taken place and had "misapplied" the applicable accounting rules.  Specifically, the Audit Committee determined, among other things, that "senior management was aware of the redistributions but either misunderstood or misapplied the appropriate accounting guidance."

68.     Indeed, in connection with the Restatement, Huron was forced to amend "certain agreements" related to Huron's acquisition-related payments to provide that "future earn-outs will be distributed only to the applicable selling shareholders and only in accordance with their equity interests on the date [Huron] acquired the business, with no required continuing employment . . . ."  In these amended agreements, Huron again made clear that its most senior management knew that these earn-out payments were being used to compensate Huron employees.  For example, according to an amended agreement relating to the Wellspring acquisition, which was dated July 30, 2009 (one day before the Restatement was announced): "[T]he direct payment of amounts to certain Huron employees from funds which would otherwise have constituted earn-out payments were discussed with Huron's management."  That amended agreement further acknowledged that, by no later than March 31, 2009 – or four months before the Restatement was announced – Huron's senior management knew the specific details of the distribution methodology used to compensate these employees. In other words, the Officer Defendants even knew who got how much, and when.

69.     The Sarbanes-Oxley Act of 2002 placed significant additional responsibilities on the boards of directors of public companies subject to the Act, like Huron, to improve corporate financial accounting and internal controls and to improve corporate financial responsibility and

disclosure. The Huron Board was sitting atop a massive ongoing scheme to falsify and thus artificially inflate the Company's reported financial results. Any real compliance with the Sarbanes-Oxley Act of 2002 would have exposed this scheme, brought it to an end, and resulted in embarrassing discharges. The Director Defendants face a substantial likelihood of liability for breaching their fiduciary duties by knowingly failing to institute and maintain proper accounting and internal controls as required by, among other authorities, the Sarbanes-Oxley Act.

70.     Moreover, the Audit Committee completely abdicated its responsibility of ensuring that effective controls were established at the Company. As stated in the Audit Committee Charter, the Audit Committee has the responsibility to "[r]eview the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures on a regular basis." However, they deliberately kept weak internal controls so that any accounting improprieties would not be uncovered.

71.     Indeed, the Company admitted to weaknesses in internal controls over financial reporting during the relevant period. The Company's Form 10-K/A filed with the SEC on August 17, 2009 stated that:

> In the Original Filing, our management, with the participation of the Company's then Chief Executive Officer and then Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act as of December 31, 2008. Based on that evaluation, our then Chief Executive Officer and then Chief Financial Officer concluded that, as of December 31, 2008, our disclosure controls and procedures were effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by us in the reports we file or submit under the Exchange Act. Based on that evaluation, they further concluded that such information was accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.
>
> In connection with the restatement described above, our management, with the participation of our current Chief Executive Officer and current Chief Financial Officer, each of whom was appointed on July 31, 2009, reevaluated our initial

conclusion. Based on that reevaluation and solely as a result of the material weakness in our internal control over financial reporting described below, we concluded our disclosure controls and procedures **were not effective as of December 31, 2008.**

*As discussed below, we have identified a material weakness in our internal control over financial reporting related to our accounting for certain acquisition-related payments received by the selling shareholders of specific businesses we acquired that were subsequently redistributed by the selling shareholders among themselves and to other select Huron employees.* As a result of our identification of such material weakness, we performed substantial additional procedures to determine how such acquisition-related payments were redistributed among such selling shareholders and to such employees and to reconcile such redistribution with our underlying records. We also engaged in a related analysis of our underlying records and our financial statements in light of the redistribution of the acquisition-related payments to determine the completeness and accuracy of our underlying records and our financial statements with respect to such redistribution. These procedures and our related analysis were undertaken to identify the accounting adjustments required with respect to the redistribution of such acquisition-related payments by the selling shareholders to ensure that our consolidated financial statements for all periods beginning with the year ended December 31, 2006 and through the year ended December 31, 2008, including quarterly periods, could be presented in accordance with GAAP.

(emphasis added).

72.     The D&O Defendants' failure to ensure effective internal controls at Huron allowed them to materially overstate its financial results.

### HURON'S FALSE AND MISLEADING MISSTATEMENTS

73.     The Officer Defendants knowingly caused, and the Director Defendants allowed, the Company to make false and misleading statements regarding its financial results, particularly related to certain acquisitions and the valuation of goodwill, in press releases and SEC filings.

74.     As known by the Officer Defendants, their improper accounting practices caused Huron's earnings releases and financial statements to misstate the Company's net income and earnings per share because the Officer Defendants knowingly failed to properly account for certain acquisition-related payments to employees of businesses that Huron acquired between 2005 and 2007.

27

75.    The D&O Defendants continued to announce and affirm the Company's financial results, which the Officer Defendants knew were materially false due to the improper accounting for certain acquisition-related payments.   As a result of the D&O Defendants' improper accounting and/or internal control practices, the Company made false and misleading statements regarding its financial results quarter after quarter and year after year.

76.    Specifically, the Company, with the knowledge, approval, and participation of each of the D&O Defendants, disseminated its false financial statements in, *inter alia*, the following press releases and Form 10-Q and 10-K filings:

a.    Earnings release for the first quarter 2006 issued on April 27, 2006;

b.    Earnings release for second quarter 2006 issued on August 8, 2006;

c.    Form 10-Q for second quarter 2006 filed with the SEC on August 8, 2006 and signed by Burge;

d.    Earnings release for third quarter 2006 issued on November 2, 2006;

e.    Form 10-Q for second quarter 2006 filed with the SEC on November 2, 2006 and signed by Burge;

f.    Earnings release for fourth quarter 2006 and for the full year of 2006 issued on February 22, 2007;

g.    Form 10-K for fourth quarter 2006 and for the full year of 2006 filed with the SEC on February 22, 2007 and signed by Holdren, Massaro, Burge, Ausley, Edwards, Lockhart, McCartney, and Moody;

h.    Earnings release for first quarter 2007 issued on May 3, 2007;

i.    Form 10-Q for first quarter 2007 filed with the SEC on May 3, 2007 and signed by Burge;

j.    Earnings release for second quarter 2007 issued on August 7, 2007;

k.    Form 10-Q for second quarter 2007 filed with the SEC on August 7, 2007 and signed by Burge;

l.    Earnings release for third quarter 2007 issued on October 31, 2007;

m.     Form 10-Q for third quarter 2007 filed with the SEC on October 31, 2007 and signed by Burge;

n.     Earnings release for fourth quarter 2007 and for the full year of 2007 issued on February 20, 2008;

o.     Form 10-K for fourth quarter 2007 and for the full year of 2007 filed with the SEC on February 21, 2008 and signed by Holdren, Massaro, Burge, Ausley, Edwards, Lockhart, McCartney, and Moody;

p.     Earnings release for first quarter 2008 issued on May 6, 2008;

q.     Form 10-Q for first quarter 2008 filed with the SEC on May 6, 2008 and signed by Burge;

r.     Earnings release for second quarter 2008 issued on August 5, 2008;

s.     Form 10-Q for second quarter 2008 filed with the SEC on August 5, 2008 and signed by Burge;

t.     Earnings for third quarter 2008 issued on October 30, 2008;

u.     Form 10-Q for third quarter 2008 filed with the SEC on October 30, 2008 and signed by Burge;

v.     Earnings release for fourth quarter 2008 and for the full year of 2008 issued on February 24, 2009;

w.     Form 10-K for fourth quarter 2008 and for the full year of 2008 filed with the SEC on February 24, 2009 and signed by Holdren, Massaro, Burge, Ausley, Edwards, Lockhart, McCartney, and Moody;

x.     Earnings release for first quarter 2009 issued on April 30, 2009; and

y.     Form 10-Q for first quarter 2006 filed with the SEC on April 30, 2009, and signed by Defendant Burge.

77.    The financial statements set forth above were false and misleading when issued because they fail to disclose the following material information:

a.     Payments were made in connection with certain acquisitions occurring from 2005 to 2007, which were redistributed among the selling shareholders in amounts that were disproportionate to their interests in the acquired businesses or to Huron employees who had been employed by the "selling shareholders";

b.    All of the payments were contingent earn-out payments, which should have been accounted for as compensation expenses but were instead accounted as goodwill in violation of GAAP;

c.    As a result, the Company's net income was overstated; and

d.    The Company's internal controls related to the valuation of these acquisitions were deficient..

## **THE TRUTH IS REVEALED**

78.    On July 31, 2009, after the close of the market, Huron shocked the market and shareholders alike by announcing that the Company intended to restate its financial results for the past three years, up to and including the first quarter of 2009. The July 31, 2009 Press Release revealed that:

- Company to restate financial statements for the fiscal years 2006, 2007 and 2008 and Q1 2009.

- Restatement pertains to non-cash charges relating to how payments received by the sellers of certain acquired businesses were subsequently redistributed among themselves and to other select Huron employees.

- Total estimated impact on net income and EBITDA for all restated periods of $57 million.

- Restatement has no impact on cash, cash flows from operations or adjusted EBITDA.

- George Massaro and James H. Roth appointed Non-Executive Chairman of the Board of Directors and Chief Executive Officer, respectively.

- Preliminary Q2 2009 revenues before reimbursable expenses in a range of $164 million to $166 million.

- Estimated full year 2009 revenues before reimbursable expenses in a range of $650 million to $680 million.

79.     The July 31, 2009 Press Release further revealed that Huron's financial statements dating back to 2006 were inaccurate and had overstated net income and EBITDA by $57 million, stating:

> Huron Consulting Group Inc. (NASDAQ: HURN), a leading provider of business consulting services, today announced that the Company will restate its financial statements for the fiscal years 2006, 2007 and 2008 and the first quarter of 2009, to correct the Company's accounting for certain acquisition-related payments received by the sellers in connection with the sale of certain acquired businesses that were subsequently redistributed among themselves and to other select Huron employees.  As a result, the historical financial statements for these periods should no longer be relied upon.  The restatement items are non-cash charges with a total estimated impact on net income and EBITDA for all restated periods of $57 million.  The restatement has no impact on cash, cash flows from operations, or adjusted EBITDA.  The sellers have recently amended their agreements related to these payments.  While there can be non-cash compensation charges causing the restatement will not continue past July 31, 2009.  In addition, the Company announced management changes, including the appointment of George Massaro as Non-Executive Chairman of the Board and James H. Roth, a founder of the Company, as Chief Executive Officer.  Both appointments follow the resignation of Gary E. Holdren as Chairman of the Board and Chief Executive Officer.

80.     The press release continued by explaining the need for a restatement of the Company's financial statements and how the Audit Committee belatedly discovered that the Company's acquisition-related payments were being funneled to Huron employees:

> The restatement relates to four businesses that the Company acquired between 2005 and 2007 (the "Acquired Businesses").  Pursuant to the purchase agreements for each of these acquisitions, payments were made by the Company to the selling shareholders upon closing of the transaction and also, in some cases, upon the Acquired Businesses achieving specific financial performance targets over a number of years ("earn-outs").  These payments are collectively referred to as "acquisition-related payments."
>
> ***It recently came to the attention of the Audit Committee of the Board of Directors that, in connection with one of these acquisitions, the selling shareholders had an agreement among***

> *themselves to reallocate a portion of the earn-out payments to an employee of the Company who was not a selling shareholder.* Following this discovery, the Audit Committee commenced an inquiry into the relevant facts and circumstances of all of the Company's prior acquisitions to determine if similar situations existed. The Audit Committee engaged legal and financial advisors to assist it with the inquiry and notified the Company's independent auditors who had not previously been aware of the Shareholder and Employee Payments described below.

> This inquiry resulted in the discovery that the selling shareholders of the Acquired Businesses:

> 1.   Redistributed portions of their acquisition-related payments among themselves in amounts that were not consistent with their ownership percentages ("Shareholder Payments") at the date of acquisition by Huron. Such payments were dependent, in part, on continuing employment with Huron or on the achievement of personal performance measures; or

> 2.   Redistributed portions of their acquisition-related payments to certain Company employees ("Employee Payments") who were not selling shareholders of the Acquired Businesses. Such payments were dependent on continuing employment with Huron or on the achievement of personal performance measures.

81.   In the press release, the Company confirmed that the failure to account for the earn-out payments as non-cash compensation expenses patently violated GAAP:

> *Under generally accepted accounting principles, including guidance promulgated by the U.S. Securities and Exchange Commission ("SEC"), actions of economic interest holders in a company may be imputed to the company itself. As the selling shareholders meet the criteria of economic interest holders in Huron, the Shareholder Payments and the Employee Payments are imputed to the Company even when the amounts that are reallocated do not differ significantly from ownership percentages at the date of the acquisition by Huron. As a result, both the Shareholder Payments and the Employee Payments are required to be reflected as non-cash compensation expense of the Company with a corresponding increase to additional paid-in capital.* There is no tax impact to these adjustments.

82.     The Company also admitted that it expected to find "material weaknesses" in its

financial reporting system:

> As a result of the matters identified above, management is
> currently in the process of reviewing its internal control over
> financial reporting and expects that it will identify one or more
> material weaknesses in the Company's internal control over
> financial reporting.  The Company will also assess its disclosure
> controls and procedures.

83.     As a result of the events leading up to the Restatement, the July 31, 2009 Press

Release further announced that defendants Holdren, Lipski, and Burge would be stepping down

from their respective positions:

> The Company announced the following management changes:
>
> George Massaro, currently Vice Chairman of the Board, has been
> appointed Non-Executive Chairman of the Board, succeeding Gary
> E. Holdren.  Massaro had previously served as Chief Operating
> Officer of Huron until May 2005, and subsequently as Vice
> Chairman of the Board.
>
> James H. Roth, one of the founders of the Company and previously
> Vice President Health and Education Consulting, has been named
> Chief Executive Officer, succeeding Holdren.  Huron's Health and
> Education Consulting segment is the Company's largest business.
>
> *          *          *
>
> James K. Rojas, another founder of the Company, has been
> appointed Chief Financial Officer, succeeding Gary L. Burge who
> will remain Treasurer and continue with the Company until the end
> of the year.  Rojas recently returned to the Company in a Corporate
> Development role.   He joins Huron from Stop & Shop
> Supermarket Company where he served as Chief Financial Officer.
>
> Wayne Lipski, previously Chief Accounting Officer, will be
> leaving the Company.
>
> Holdren has resigned as Chairman and Chief Executive Officer of
> the Company effective July 27, 2009 and will leave the Company
> at the end of August.
>
> "I am greatly disappointed and saddened by the need to restate
> Huron's earnings.  My management team and I have continually

strived to establish legal, accounting and corporate governance conventions that are above reproach," said Holdren. "However, I am persuaded that, because of the manner in which selling shareholders' earn-out proceeds were distributed in certain recent transactions, Huron's accounting was incorrect. Because the issue arose on my watch, I believe that it is my responsibility and my obligation to step aside."

\*   \*   \*

No severance expenses are expected to be incurred by the Company as a result of the management changes described above.

84. The fact that Defendants Holdren, Burge, and Lipski did not receive any severance means that they were terminated for cause. Specifically, as of March 23, 2009, according to Huron's SEC filings, Holdren was entitled to more than $22 million in severance if his employment was terminated without cause or if he resigned for strictly defined "good reasons." By contrast, Holdren was not entitled to any severance if his employment was terminated for cause, which could only be established by an affirmative vote of at least 75% of the disinterested members of the Board. Accordingly, the only plausible inference that can be drawn from the fact that Holdren "resigned" without any severance is that he was terminated for cause. Termination for cause is defined in §1.5(b)(i)(3) of a publicly disclosed Amended and Restated Senior Management Agreement dated January 29, 2007, as follows: "the Executive's misconduct that results in material financial detriment to the Company or its affiliates or a material detrimental effect on the business or the reputation of the Company or its affiliates."

85. Defendant Burge similarly resigned his position as CFO without severance, on July 31, 2009. As with Defendant Holdren, this "resignation" was a result of Burge's misconduct. Specifically, on November 22, 2002, Defendant Burge had entered into a "Senior Management Agreement" with Huron, which automatically renewed for one year periods on an annual basis. Under the terms of Burge's employment agreement, Burge was entitled to

severance equal to six months' base salary and earned but unpaid annual bonus if his employment was terminated by Huron without cause. As of March 23, 2009, the total value of Burge's severance was more than $200,000. Thus, as with Holdren, the most plausible inference to be drawn from Burge's "resignation" without any severance is that he was terminated for cause.

86.     Defendant Lipski resigned his position as Chief Accounting Officer without severance, on July 31, 2009. Because Lipski by his own admission oversaw all accounting-related areas at Huron, including internal controls, accounting policies, acquisition accounting, and employee expense, was actively involved in the Company's acquisitions, and oversaw the work provided to the external auditors, the most plausible inference to be drawn from the fact that Lipski "resigned" without any severance is that he was terminated for cause.

87.     Also on July 31, 2009, Huron issued a Current Report (Form 8-K) that further described the Restatement. In pertinent part, the Current Report filed by Huron repeated much of the above-quoted language from the July 31, 2009 Press Release and further stated:

> On July 31, 2009, Huron Consulting Group Inc. (the "Company") issued a press release announcing that it will restate its financial statements for the fiscal years 2006, 2007 and 2008 and the first quarter of 2009, to correct the Company's accounting for certain acquisition-related payments received by the sellers in connection with the sale of certain acquired businesses that were subsequently redistributed among themselves and to other select Huron employees. More information concerning the restatement is discussed below under Item 4.02, which discussion is incorporated by reference herein.

88.     The effect of the Restatement on Huron's business and profits is profound. In its July 31, 2009 Press Release, the Company admitted that the Restatement "significantly reduced the Company's net income, earnings per share and EBITDA for each of the affected periods" (emphasis added). While the Company has attempted to downplay the damage and effect of the

Restatement, it represents a huge blow to the Company and its future prospects. For instance, in 2009, Huron announced net income of $41 million, but as a result of the Restatement that number has been reduced by over 75% to $10 million. Further, the Company also disclosed that, as result, the aggregate EBITDA for fiscal year 2008 was sliced by a quarter from $120 million to only $91 million. Finally, in this same announcement, Huron informed investors that its Officer Defendants Holdren, Lipski and Burge, respectively, were resigning because of the accounting scandal.

89. The announcement of the Restatement not only came as a complete shock to the market, but immediately caused Huron's common stock to lose almost 70% of its value in one day, dropping from $44.35 per share on July 31, 2009 to $13.69 at the close of the next trading day, on unusually heavy volume.

90. On August 5, 2009, *The Wall Street Journal* published an article entitled "Huron Takes Big Hit as Accounting Falls Short." The article quoted analysis of Huron's Restatement:

> "One of their businesses is forensic accounting – they're experts in this," says Sean Jackson, an analyst at Avondale Partners in Nashville, Tenn., who dropped his rating to the equivalent of "hold" from "buy." "Investors are saying, 'These guys had to know what happened with the accounting, or they should have known.'"

> *         *         *

> Employees and big producers now might bolt from Huron, Avondale Partners' Mr. Jackson says.

> "It's still unclear what happened, but it's almost irrelevant at this point," says Tim McHugh, an analyst at William Blair & Co., who has the equivalent of a "hold" on the stock, down from a "buy" last week. "The company's brand has been impaired and turnover of key employees is a significant risk."

91.     As of the date of this Complaint, Huron still has not issued a report explaining how the accounting irregularities were permitted to continue at a company that is known for its accounting expertise.

92.     On or about August 11, 2009, Huron filed with the SEC a Form 8-K, which stated that "the SEC is commencing an investigation with respect to the acquisition-related matters. The Company intends to cooperate with the SEC in its investigation."

93.     In addition, the United States Attorney's Office for the Northern District of Illinois ("USAO") has also requested information from Huron regarding the facts and circumstances surrounding the restatement. Huron has provided the USAO with documents that were previously provided to the SEC.

## THE OFFICER DEFENDANTS' UNJUST ENRICHMENT

94.     As stated in the Company's proxy statements, executive incentive compensation is based mainly on the financial performance of the Company. However, because the Company's financial results have been artificially inflated from 2005 to 2007 as a result of the D&O Defendants' misconduct, certain defendants have received excess and unearned compensation based upon the Company's false and overstated financial results.

95.     The Company's proxy statements similarly inform shareholders that "[w]hile the Company provides what it considers competitive base salaries, it also believes that a substantial portion of the compensation of each executive should consist of at-risk pay that takes into account the Company's growth in revenues before reimbursable expenses ("net revenues"), the Company's profitability, measured by diluted earnings per share, earnings before interest, taxes, depreciation and amortization ("EBITDA") and individual performance."

96.     The Company's proxy statement filed with SEC on March 31, 2006 states that "[a]nnual incentives are designed to link a significant portion of each executive's compensation to the Company's performance and to recognize individual contribution to the success of the Company in achieving its performance goals.  Each executive has a target bonus with specific goals and performance objectives. The majority of executive incentives are based on the Company achieving financial performance targets."

97.     The Company's proxy statement filed with SEC on March 23, 2007 states that "[t]he annual cash incentive to executive officers is designed to reward Company financial performance" and that "[t]he 2006 goals for the CEO's individual award, which were designed to achieve profitable growth for the Company, included targets of 20% organic revenue growth, retention of top performing managing directors, successful completion and integration of accretive acquisitions and increases in sales to significant clients.  The other executive officers are expected, in each of their respective roles and areas of expertise and responsibility, to contribute to the achievement of the goals set for the CEO."

98.     The Company's proxy statement filed with SEC on March 24, 2008 states that "[t]he annual cash incentive to executive officers is designed to reward Company financial performance" and that "[t]he 2007 goals for the CEO's individual component consisted of a number of goals, principally the following: retention of top performing managing directors, successful completion and integration of accretive acquisitions, and increases in sales to significant clients.  The other executive officers are expected, in each of their respective roles and areas of expertise and responsibility, to contribute to the achievement of the goals established for the CEO."

99.    The Company's proxy statement filed with the SEC on March 26, 2009 specifically provides the 2008 goals on which Huron executive's annual cash incentive compensation are based:

> The 2008 goals for the CEO's annual cash incentive consisted principally of the following: ***Company financial performance***, retention of top performing managing directors, ***successful completion and integration of accretive acquisitions***, adequately addressing underperforming individuals or areas of the Company's business, and increases in sales to significant clients. The Company does not set specific individual goals for the other executive officers. The other executive officers are expected, in each of their respective roles and areas of expertise and responsibility, to contribute to the achievement of the goals established for the CEO.  (emphasis added).

100.    The 2006-2009 proxies further state that "[t]he long-term equity incentive for executive officers is designed to focus management on increasing stockholder value and to provide a vehicle to share the benefits of the Company's growth with those who create it."

101.    Therefore, based on the Company's materially misleading and inaccurate financial results for fiscal years 2005 through 2007, defendants Holdren, Burge and Massaro were overpaid salaries, cash bonuses, restricted stock awards and grants of stock options to purchase Huron common stock.

102.    Specifically, defendants Holdren, Burge and Massaro, based on the Company's inflated financial statements resulting from their own misconduct, received the following excessive and unearned compensation, including stock and option awards:

| Defendant | Year | Salary | Cash Bonus | Stock Award | Number of Options Granted |
|---|---|---|---|---|---|
| Holdren | 2007 | $1,100,000 | - | $4,161,593 | 72,243 |
| | 2006 | $800,000 | $775,000 | $1,215,529 | 74,531 |
| | 2005 | $800,000 | $925,000 | $39,300 | - |
| Burge | 2007 | $400,000 | - | $581,644 | 10,674 |
| | 2006 | $325,000 | $215,000 | $273,939 | 10,788 |
| | 2005 | $275,000 | $250,000 | $14,100 | - |
| Massaro | 2005 | $600,000 | $300,000 | - | 19,600 |

103.    As a direct and proximate result of their breaches of fiduciary duties, as alleged herein, defendants Holdren, Burge and Massaro were unjustly enriched by their receipt of the salaries, cash bonuses, and stock-based awards set forth above, the amounts of which would have been substantially less, if any, had the Company's financial results been accurately recorded.

### HOLDREN'S INSIDER SELLING

104.    During the relevant period, defendant Holdren, based on his knowledge of material non-public information regarding Huron's overstated income and earnings, sold shares in Huron stock at inflated prices, for total gross proceeds of almost $9.5 million.

| Date(s) of Sale(s) | Number of Shares Sold | Sale Price Per Share | Gross Proceeds |
|---|---|---|---|
| 2/27/07 | 10,000 | $63.50 | $635,000.00 |
| 2/28/07 | 10,000 | $63.05 | $630,500.00 |
| 3/1/07 | 10,000 | $62.79 | $627,900.00 |
| 3/2/07 | 10,000 | $62.88 | $628,800.00 |
| 3/5/07 | 10,000 | $63.82 | $638,200.00 |
| 3/6/07 | 10,000 | $64.44 | $644,400.00 |
| 5/9/07 | 15,000 | $65.81 | $987,150.00 |
| 5/11/07 | 25,000 | $65.07 | $1,626,750.00 |
| 5/14/07 | 20,000 | $65.64 | $1,312,800.00 |
| 7/2/08 | 7,226 | $46.47 | $335,792.22 |
| 8/8/08 | 5,000 | $59.84 | $299,200.00 |
| 8/11/08 | 5,000 | $62.19 | $310,950.00 |
| 8/12/08 | 10,000 | $62.21 | $622,100.00 |
| 2/27/09 | 4,750 | $41.59 | $197,552.50 |
| 6/11/09 | 20,000 | $50.00 | $1,000,000.00 |

| Date(s) of Sale(s) | Number of Shares Sold | Sale Price Per Share | Gross Proceeds |
|---|---|---|---|
| 7/1/09 | 7,330 | $46.73 | $342,530.90 |
| | **151,976** | | **$9,497,094.72** |

105.    In contrast with these sales, though Holdren acquired millions of dollars worth of Huron stock through stock options, Holdren did not purchase a single share of Huron stock at a fair market price during the relevant period.

106.    The stock sales described above were not part of any normal or regular pattern or practice of such sales by defendant Holdren, but rather were unusual in that:

(a)    These sales were not in accordance with a pre-arranged 10b5-1 trading plan or to satisfy tax obligations but were actually in addition to planned sales by these defendants in accordance with 10b5-1 plans and tax withholding plans; and

(b)    Holdren's stock sales occurred soon after the Company's false and misleading financial statements were filed with the SEC, with such financial statements making no mention of the Company's improper accounting practices, described *supra*.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

107.    Plaintiffs bring this action derivatively in the right and for the benefit of Huron to redress injuries suffered, and to be suffered, by Huron as a direct result of the D&O Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment.  Huron is named as a Nominal Defendant solely in a derivative capacity.

108.    Plaintiffs are and were owners of Huron stock during times relevant to the D&O Defendants' wrongful course of conduct alleged herein.  Accordingly, Plaintiffs will adequately and fairly represent the interests of Huron in enforcing and prosecuting its rights.

109.    Demand on these individuals would be an exercise in futility and is excused because, under these circumstances, the directors are incapable of making an impartial decision regarding whether to institute litigation.

110.    The Board currently consists of seven (7) directors: defendants Massaro, Ausley, Edwards, Lockhart, Moody, and McCartney and non-defendant James H. Roth.  A majority of the Board (6 out of 7) are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action, as follows:

111.    Several of the directors are experts in finance and accounting.  Defendants Massaro and Ausley are certified public accountants and thus experts in accounting.  Defendant McCartney has served as a corporate CFO.  Thus, he is intimately familiar with the subject transactions and related accounting as well as quarterly filings and earnings reports.  McCartney also holds an MBA in finance.  Similarly, Defendant Lockhart has a background in the field of private equity and is thus an expert in finance and management.  Importantly, the accounting issues at bar are not esoteric; they are straightforward.  Given that each of these Director Defendants is erudite in matters of finance and accounting, especially in the context of the Company's acquisitions, their respective duties to exercise adequate oversight over the Company's affairs were implicated.  Their collective failure to exercise this oversight function permitted management (three members of which were terminated for cause) to engage in this accounting charade and damage the Company.

112.    Given their expertise, it is unreasonable for these Director Defendants to claim that they did not know that it was improper to mischaracterize incentive payments to the effect of inflating reported income and misstating goodwill.

113.    The Director Defendants knowingly failed to make a good faith effort to implement adequate internal controls to prevent the misconduct and actively monitor the reporting and accounting procedures related to key acquisitions and the valuation of goodwill in connection therewith.  Their sustained and systematic failure to exercise oversight allowed the Officer Defendants to carry out the improper practices, as alleged herein.  Therefore, the Director Defendants face a substantial likelihood of liability for breaching their fiduciary duties, as alleged herein.

114.    Defendants McCartney, Edwards and Ausley, in particular, as members of the Audit Committee, knowingly failed to make a good faith effort to implement appropriate monitoring, reporting or information controls to institute preventive and corrective measures. Therefore, defendants McCartney, Edwards and Ausley face a substantial likelihood of liability for breaching their fiduciary duties, as alleged herein.

115.    Furthermore, each of the Director Defendants failed to exercise the requisite oversight over the Company's acquisitions from 2005 to 2007, to ensure that earn-out payments payments were detected and goodwill was accounted for in compliance with GAAP.  Indeed, given the acquisitions' sheer size and relevance to the Company's growth strategy and the extreme importance of goodwill to the acquisitions and ultimately the Company's financials, the Director Defendants had a duty to implement internal controls to oversee and monitor such matters..

116.    Moreover, the Company has conceded in its restatement of earnings that senior managers were aware of side agreements with selling shareholders to reallocate acquisition payments amongst themselves in amounts disproportionate to their ownership, and to employees not eligible for goodwill payments.  Given the knowledge of senior managers, the Director

Defendants were duty bound to exercise careful oversight to ensure that these practices comported with GAAP.

117.    In a similar vein, Huron has admitted that managers did not disclose the agreements to the Company's outside auditors.  The members of the Audit Committee, however, during the course of their annual review (assuming it was done properly) should have uncovered this rudimentary accounting trick, had they exercised the requisite oversight mandated by their positions and inquired why it was kept from the public auditors.

118.    Defendants Ausley, Lockhart, Moody, and McCartney all served on the Compensation Committee.  These Defendants missed at least two obvious opportunities to uncover the improper accounting.  First, they failed to conduct a reasonable review of the acquisition-related payments at the time they were approved and then paid in order to determine whether the payments qualified as a compensation expense under GAAP and should have been accounted for as such.  Second, in reviewing and approving the bonuses received by senior management based on the profits that Huron reported, the Compensation Committee was obligated to scrutinize the accounting of those profits to ensure it had a reasonable basis, which they also failed to do.  As members of the Compensation Committee, they were duty bound to investigate the circumstances of side agreement relating to compensation that they were obligated to review and sign off on before payments were made.  This duty to investigate is more pronounced given that the Company had admitted that these agreements were well known to management at the time, gave rise to the termination of three managers for cause, and were extremely germane to the Company's growth plan.

119.    Defendants Ausley and McCartney both served on the Audit and Compensation Committees (McCartney was chair of the Audit Committee).  In those dual capacities, these two

Defendants were well positioned to detect accounting irregularities in the area of employee compensation and internal audit. However, these two Defendants failed to notice gross accounting improprieties during the relevant period; this failure was inexcusable, especially give their professional degrees and the sheer size of the payments coupled with their importance to the firm's growth strategy.

120. Finally, Huron purports to be a governance and compliance watchdog. It is inexcusable that these violations of law occurred under the Board's watch.

121. The chart included below further illustrates that demand on this Board is futile:

| Director Defendants | Professional Expertise | Committee Service: | | | Substantial Likelihood of Liability |
|---|---|---|---|---|---|
| | | Compensation Committee | Audit Committee | Governance Committee | |
| Ausley | | ✓ | ✓ | ✓ | ✓ |
| Edwards | CPA | | ✓ | ✓ | ✓ |
| Lockhart | MBA | ✓ | | ✓ | ✓ |
| Massaro | CPA | | | | ✓ |
| McCartney | MBA; CFO | ✓ | ✓ | | ✓ |
| Moody | | ✓ | | ✓ | ✓ |

122. The Company's improper practices were not, and could not have been, the result of an exercise of good faith business judgment. On the contrary, the improper practices were the result of bad faith conduct that is not protected by the business judgment rule.

## COUNT I

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
(Against D&O Defendants)

123. Plaintiffs incorporate by reference and reallege the allegations set forth above as though fully set forth herein.

124.     The D&O Defendants all owed and owe a fiduciary duty to Huron and its stockholders.  By reason of their fiduciary relationships, the D&O Defendants all owed and owe Huron the highest obligation of good faith, fair dealing and loyalty in the management and administration of the affairs of the Company, as well as in the financial accounting, auditing, and reporting of the Company.  Moreover, the D&O Defendants owed and owe the duty of full and candid disclosure of all material facts thereto.

125.     The Officer Defendants violated and breached their fiduciary duties loyalty and, good faith by, *inter alia*, knowingly causing the Company to improperly account for earn-out payments to certain Huron employees and knowingly publishing financial statements that they knew did not conform to GAAP.

126.     Moreover, as directors of Huron, the Director Defendants have a fiduciary duty to the Company to implement oversight policies and systems and establish effective internal controls.  However, these defendants abdicated their fiduciary duty of good faith through their sustained and systematic failure to exercise oversight.

127.     As a direct and proximate result of the D&O Defendants' failure to perform their fiduciary obligations, Huron has suffered substantial monetary damages, as well as further and even greater damage in the future, including damage to Huron's reputation and good will.  The D&O Defendants are liable to the Company as a result of the misconduct alleged herein.

128.     Plaintiff on behalf of Huron has no adequate remedy at law.

## COUNT II

### DERIVATIVE CLAIM FOR WASTE OF CORPORATE ASSETS
#### (Against D&O Defendants)

129.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

46

130.    As a result of the improper accounting described herein, the D&O Defendants have knowingly caused Huron to waste valuable corporate assets by paying incentive-based bonuses to certain of its executive officers.

131.    As a direct and proximate result of the D&O Defendants' waste of corporate assets, the D&O Defendants are liable to the Company.

132.    Plaintiff on behalf of Huron has no adequate remedy at law.

## COUNT III

### DERIVATIVE CLAIM FOR UNJUST ENRICHMENT
### (Against Officer Defendants)

133.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

134.    Defendant Holdren was unjustly enriched by his receipt of proceeds from his illegal sales of Huron stock, as alleged herein, and it would be unconscionable to allow Holdren to retain the benefits of his improper conduct.

135.    To remedy his unjust enrichment, the Court should order Holdren to disgorge to the Company all proceeds derived from his improper sales of Huron stock.

136.    The Officer Defendants were unjustly enriched by their receipt of salaries, cash bonuses, restricted stock awards and stock option grants to purchase Huron common stock based on false and misleading financial statements, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf, and derivatively on behalf of Huron, prays for judgment as follows:

A.    An award of monetary damages to Plaintiff, on behalf of Huron, against all the

D&O Defendants and in favor of the Company for the amount of damages sustained by Huron as a result of the D&O Defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and statutory violations, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and statutory provisions sued hereunder, including attaching, impounding, or otherwise restricting the proceeds of the D&O Defendants' trading activities or their other assets so as to assure that Plaintiff, on behalf of Huron, has an effective remedy;

C.    Awarding to Huron restitution from all Defendants, and each of them and ordering disgorgement of all profits, benefits or other compensation obtained by the Defendants;

D.    Awarding Plaintiff the costs and disbursements of the action, including reasonable allowance of fees for Plaintiff's attorneys, experts and accountants; and

E.    Granting Plaintiff such other and further relief as the Court deems just and proper.

DATED: October 12, 2010

**WOLF HALDENSTEIN ADLER  FREEMAN & HERZ LLC**

/s/ John E. Tangren
Mary Jane Fait
Adam J. Levitt
John E. Tangren
55 West Monroe Street, Suite 1111
Chicago, Illinois  60603
Tel:  (312) 984-0000
Fax:  (312) 984-0001

**WOLF HALDENSTEIN ADLER  FREEMAN & HERZ LLP**
Gregory M. Nespole
270 Madison Avenue
New York, New York 10016
Tel: (212) 545-4600
Fax: (212) 545-4653

**THE MILLER LAW FIRM, P.C.**
E. Powell Miller
Marc L. Newman
Courtney B. Ciullo
950 West University Drive
Suite 300
Rochester, Michigan  48307
Tel:  (248) 891-2200

**BARROWAY TOPAZ KESSLER**
  **MELTZER & CHECK, LLP**
Eric L. Zagar
Robin Winchester
Tara P. Kao
280 King of Prussia Road
Radnor, Pennsylvania  19087
Tel:  (610) 667-7706

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| OAKLAND COUNTY EMPLOYEES' RETIREMENT SYSTEM, | ) ) ) ) | |
| Plaintiff | ) ) ) | |
| v. | ) ) ) | **Case No. 09-cv-6284** |
| GEORGE E. MASSARO, DUBOSE AUSLEY, JAMES D. EDWARDS, H. EUGENE LOCKHART, JOHN S. MOODY, JOHN MCCARTNEY, GARY E. HOLDREN, GARY L. BURGE, AND WAYNE LIPSKI, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| HURON CONSULTING GROUP INC., | ) ) ) | |
| Nominal Defendant. | ) | |

## VERIFICATION

|  |  |  |
|---|---|---|
| STATE OF MICHIGAN | ) | |
|  | ) | s.s.: |
| COUNTY OF OAKLAND | ) | |

Keith J. Lerminiaux, being duly sworn, deposes and says:

I am the Deputy Corporation Counsel for Oakland County, Michigan. As Deputy Corporation Counsel, I have, on behalf of Plaintiff, read the foregoing Verified Amended Consolidated Shareholder Derivative Complaint brought on behalf of Nominal Defendant Huron Consulting Group Inc, against its directors and George E. Massaro, Dubose Ausley, James D. Edwards, H. Eugene Lockhart, John S. Moody, John Mccartney, Gary E. Holdren, Gary L.

Burge, David M. Shade and Wayne Lipski. I have reviewed the allegations made in the Complaint on behalf of the Plaintiff for the benefit of the Nominal Defendant, and to those allegations to which Plaintiff has personal knowledge, Plaintiff believes those allegations to be true. As to those allegations to which Plaintiff does not have personal knowledge, Plaintiff relies on its counsel and their investigation and for that reason believes them to be true. Plaintiff further declares that it is a current holder, and has been a holder, of common stock during the time period, in which the wrongful conduct alleged and complained of in the Complaint, occurred.

This action is not a collusive one to confer jurisdiction on a Court of the United States which would not otherwise have jurisdiction

_____
Keith J. Verminiaux

Signed and sworn to before me in Oakland County, Michigan, on the 5ᵗʰ day of October, 2010.

_____
SANDRA K. BEEDLE
Notary Public, State of Michigan, Oakland County

My Commission expires: 5-31-2017.
Acting in the County of Oakland

## VERIFICATION

I, Philip R. Wilmore, hereby verify that I have authorized the filing of the attached Verified Amended Consolidated Shareholder Derivative Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.


DATE: _10-1-10_

Philip R. Wilmore

## VERIFICATION

I, Lawrence J. Goelz, hereby verify that I have authorized the filing of the attached Verified Amended Consolidated Shareholder Derivative Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: _10/4/10_

Lawrence J. Goelz

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 12th day of October, 2010 copies of Plaintiffs'
***Verified Amended Consolidated Shareholder Derivative Complaint*** were served by causing a
true and correct copy of same to be delivered to all Filing Users through the Court's ECF system.


<u>        /s/ John E. Tangren        </u>
John E. Tangren